AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Connecticut

United States District Court
District of Connecticut
FILED BRIDGEPORT
9/12/17 20
Roberta D. Tabora, Clerk
By _____ Deputy Clerk

| | |
|---|---|
| United States of America<br>v.<br>ANDRE FLOTRON<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)  3:17mj467(WIG)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 2008 - November 2013__ in the county of __Fairfield__ in the _____ District of __Connecticut__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371;<br>18 U.S.C. § 1343;<br>18 U.S.C. § 1348(1); and<br>7 U.S.C. §§ 6c(a)(5)(C) & 13(a)(2) | Conspiracy;<br>Wire Fraud;<br>Commodities Fraud; and<br>Spoofing |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF FEDERAL BUREAU OF INVESTIGATION SPECIAL AGENT DAMIAN PLATOSH

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI SPECIAL AGENT DAMIAN PLATOSH
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/12/2017

_____
*Judge's signature*

City and state: BRIDGEPORT, CONNECTICUT

WILLIAM I. GARFINKEL, U.S. MAGISTRATE JUDGE
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT            :
                                :   ss Bridgeport, Connecticut
COUNTY OF FAIRFIELD             :   September 12, 2017

DAMIAN R. PLATOSH, being duly sworn, deposes and states the following:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for approximately 20 years. I am currently assigned to the New Haven Division of the FBI. During my tenure with the FBI, I have received training in the investigation of financial crimes and in financial analysis. As part of my duties as a Special Agent, I have investigated criminal violations relating to complex corporate fraud. During my career, I have been the affiant on applications for search warrants and arrest warrants in federal criminal investigations.

2. I submit this Affidavit in support of a criminal complaint and arrest warrant for ANDRE FLOTRON ("FLOTRON") for: (a) conspiracy, in violation of Title 18, United States Code, Section 371; (b) wire fraud, in violation of Title 18, United States Code, Section 1343; (c) commodities fraud, in violation of Title 18, United States Code, Section 1348(1); and (d) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

3. For the reasons set forth below, there is probable cause to believe that on or about certain days beginning in or around at least July 2008 and continuing until in or around at least November 2013, FLOTRON, along with his co-conspirators, in the District of Connecticut and elsewhere:

    a. knowingly, willfully, and with the intent to defraud, conspired and agreed with others to commit offenses against the United States, that is, wire fraud, commodities fraud, and spoofing, and one or more co-conspirators performed and committed an act to effect, and in

1

furtherance of, the object of the conspiracy, in violation of Title 18, United States Code, Section 371;

b. having knowingly, and with the intent to defraud, devised and intending to devise, and willfully participated in, a scheme and artifice to defraud participants in the market for futures contracts for gold, silver, platinum, and palladium (the "precious metals futures contracts") on the Commodity Exchange, Inc. ("COMEX") and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343;

c. knowingly, and with the intent to defraud, executed, and attempted to execute, and willfully participated in, a material scheme and artifice to defraud market participants in connection with commodities for future delivery, that is, precious metals futures contracts, in violation of Title 18, United States Code, Section 1348(1)[1]; and

d. knowingly engaged in trading, practice, and conduct on or subject to the rules of a registered entity – COMEX – that was "spoofing," that is, bidding and offering with the intent, at the time the bid or offer was entered, to cancel the bid or offer before execution, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).[2]

4. The information supplied in this Affidavit is based upon: (a) my discussion with another law enforcement officer who has assisted in the investigation; (b) my personal knowledge and observations; (c) my training and experience; (d) my review of certain information obtained from witnesses, including a witness who has provided information related to his knowledge of the conduct under investigation (Bank A Trader #1)[3]; and (e) analysis of

---

[1] The Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted on May 20, 2009, expanded the anti-fraud provisions of the federal securities fraud statute, 18 U.S.C. § 1348, to apply to fraud involving commodities options and futures. *See* FERA § 2(e)(1), Pub. L. 111-21, 123 Stat. 1618.

[2] Congress enacted the anti-spoofing provision, 7 U.S.C § 6c(a)(5)(C), as an amendment to the Commodity Exchange Act, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which became effective on July 16, 2011. *See* Dodd-Frank Act §§ 747, 754; *see also, e.g.*, Antidisruptive Practices Authority Contained in the Dodd-Frank Wall Street Reform and Consumer Protection Act, 75 Fed. Reg. 67301-01, 67302 (Nov. 2, 2010).

[3] The identity of Bank A Trader #1 is known to Your Affiant. On October 27, 2016, the U.S. Department of Justice ("DOJ") entered into an agreement with Bank A Trader #1 under which the DOJ agreed not to criminally prosecute Bank A Trader #1 for any crimes related to his

2

trading data presently available and related information obtained by the FBI in connection with the investigation.

5.  This Affidavit is being executed as part of an ongoing investigation and is based on my current understanding of the relevant facts based on the above. As the investigation proceeds, new facts may come to light that qualify or contradict prior facts. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the criminal complaint and arrest warrant, Your Affiant has not included each and every fact known concerning this investigation. Your Affiant has set forth only the facts that I believe are necessary to establish that there is probable cause to believe that FLOTRON has violated: (a) Title 18, United States Code, Section 371; (b) Title 18, United States Code, Section 1343; and (c) Title 18, United States Code, Section 1348(1); and (d) Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

## BACKGROUND

6.  During the relevant time period, Bank A, together with its subsidiaries and affiliates, was one of the largest global banking and financial services companies in the world. Bank A had operations in the United States, elsewhere in the Americas, Europe, Asia-Pacific, and other locations. Bank A operated a global commodities trading business that included the trading of precious metals futures contracts. Bank A's primary precious metals futures trading desks were located in: (a) Stamford, Connecticut; (b) Zurich, Switzerland; and (c) the Republic of Singapore.

---

participation in spoofing and market manipulation in the precious metals futures market and the foreign exchange market that occurred between 2008 and 2012, and Bank A Trader #1 has agreed to cooperate fully and to provide the DOJ with truthful and complete information.

3

7. Until approximately January 2014, FLOTRON was employed as a precious metals trader at Bank A. In approximately July 2008, FLOTRON was a precious metals trader on Bank A's trading desk in Stamford, Connecticut. At all relevant times, FLOTRON traded precious metals futures contracts in his capacity as a precious metals trader at Bank A.

8. The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including COMEX, which was based in New York, New York. At all relevant times, COMEX was a registered entity, operating as a Designated Contract Market. COMEX utilized an electronic trading system called "Globex."

9. Globex was a global electronic trading platform operated by the CME Group, which utilized computer servers located in Chicago and Aurora, Illinois. Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (i.e., offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels." Globex allowed market participants to trade futures contracts either at the exchange itself or from a location virtually anywhere in the world. Through Globex, markets operated by the CME Group offered trading opportunities in futures contracts for various commodities, including precious metals futures contracts.

10. COMEX, through the Globex system, allowed traders to place orders in the form of "bids" to buy or "offers" to sell a futures contract. An order was "filled" or "executed" when a buyer and seller bought and sold a particular contract. The minimum price increment at which a futures contract could trade on COMEX was called a "tick," and the value of a tick for each contract was set by COMEX. Futures contracts traded on set, periodic expiration cycles (*i.e.*, monthly or quarterly). A "near-month" futures contract was one that would expire on the next expiration date for that type of futures contract.

11. A futures contract was a standardized, legally binding agreement that, once executed, obligated the parties to the contract to buy or to sell a specific product or financial instrument in the future. That is, the buyer and seller of a futures contract agreed on a price today for a product or financial instrument to be delivered (by the seller), in exchange for money (to be provided by the buyer), on a future date.

12. Futures contracts were traded on markets designated and regulated by the Commodity Futures Trading Commission (the "CFTC"), the federal agency established by federal statute to regulate, among many other things, transactions related to and involving the purchase and sale of futures contracts.

13. Gold, silver, platinum, and palladium futures contracts were contracts for the delivery of gold, silver, platinum, and palladium, respectively, in the future at an agreed-upon price. The gold, silver, platinum, and palladium futures contracts were traded on the COMEX, using the Globex system.

14. Based on information provided to me by another law enforcement officer conducting the investigation, Your Affiant has learned that:

    a. "Spoofing" was the unlawful practice of bidding or offering with the intent, at the time the bid or offer is placed, to cancel the bid or offer before it is executed. Spoofing can be used as a method to engage in market manipulation.

    b. One of the many ways that spoofing can be used as a form of market manipulation is as follows:

        i. A trader places one or more large orders either to buy or to sell futures contracts on one side of the market, which the trader intends, at the time the orders are placed, to cancel before they are executed (the "Spoof Orders").

        ii. At or near the same time the Spoof Orders are placed, the same trader also places genuine orders, in a much lower quantity, on the

5

        opposite side of the market, which the trader, by contrast, intends to execute (the "Primary Orders").

iii.    By placing the Spoof Orders, the trader intends to create a market imbalance, injecting false and misleading information (i.e., orders the trader does not intend to execute) into the market to create the false impression of increased supply or demand.

iv.    This false and misleading information may, and often does, cause other market participants to buy and to sell futures contracts at prices, and at times, that they otherwise would not because, among other things, market participants react to the apparent (although artificial) increase in supply or demand that might, and often does, affect futures contract prices.

v.    When the trader who enters Spoof Orders induces enough market participants to buy or to sell futures contracts at a price that they otherwise would not have traded, the price of a given futures contract may change, resulting in the creation of a new, but artificially inflated or deflated, price. When the new artificial price has changed enough, the trader's Primary Orders trade at prices and at times that otherwise would not have been available, but for the Spoof Orders.

## SUMMARY OF THE INVESTIGATION

### Overview of the Scheme to Defraud and Spoofing Practice

15.    The FBI has been investigating the existence of materially deceptive trading activity in the markets for certain precious metals futures contracts by, among others, FLOTRON and Bank A Trader #1.

16.    Based on information uncovered by the FBI during the investigation, which is discussed in more detail below, on certain days beginning in or around at least July 2008 and continuing until in or around at least November 2013, in the District of Connecticut and elsewhere, FLOTRON and his co-conspirators (a) devised, executed, and participated in a scheme to defraud other market participants, and (b) engaged in the practice of spoofing, all in

connection with near-month precious metals futures contracts, all of which were financial products traded on the COMEX exchange.

17. Specifically, FLOTRON and his co-conspirators placed one or more large orders for precious metals futures contracts on one side of the market which, at the time FLOTRON and his co-conspirators placed the orders, they intended to cancel before execution. The purpose of these Spoof Orders was to trick other market participants by injecting materially misleading information into the market that indicated increased supply or demand, but was not genuine because FLOTRON and his co-conspirators never intended to execute the bids or offers contained in these Spoof Orders. This, in turn, often induced market participants to buy or to sell precious metals futures contracts at prices and at times that would not have otherwise. While the Spoof Orders were pending, and in those instances when the Spoof Orders caused or assisted in causing price movements, FLOTRON and his co-conspirators often executed smaller Primary Orders on the opposite side of the market in an attempt to profit or otherwise benefit from the artificial movement in price that they had caused or assisted in causing.

FLOTRON's Personal Executions of the Scheme to Defraud and Spoofing Practice

18. Based on evidence uncovered by the FBI during the investigation, beginning in or around at least July 2008 through in or around at least November 2013, FLOTRON sought to enrich himself, Bank A, and his co-conspirators through a scheme to defraud and spoofing practice in connection with the purchase and sale of precious metals futures contracts on the COMEX. By placing a large-volume order for precious metals futures contracts at certain price levels with the intent, at the time the order was placed, to cancel the order before execution, FLOTRON created the false appearance of substantial supply or demand in order to fraudulently induce other market participants to react to his deceptive market information.

19. FLOTRON implemented, at various times, the following pattern of order and trade activity in the precious metals futures contract markets. There is probable cause to believe that the pattern articulated below is materially deceptive and constitutes spoofing:

    a. First, FLOTRON placed a small Primary Order to buy or to sell (typically between one and five lots) on one side of the market close to the prevailing price at which that given precious metals futures contract was trading;

    b. Second, either before or after placement of the Primary Order, FLOTRON placed a larger order on the opposite side of the market from the Primary Order that was at least ten times as large as the size of the Primary Order (the "Opposite Order") and close to the prevailing price at which that given precious metals futures contract was trading;

    c. Third, at least one lot of FLOTRON's Primary Order was filled; and

    d. Fourth, after filling at least one lot of his Primary Order, FLOTRON would quickly cancel his Opposite Order, at most no more than five seconds after placing the Opposite Order and before the Opposite Order could be executed.

20. For example, FLOTRON engaged in the following:

    a. On October 14, 2013, at 8:26:47.706 a.m.[4], FLOTRON placed a Primary Order to buy five gold futures contracts at the price of $1,284.80, which was one level off the prevailing price at that point in time;

    b. Second, at 8:26:48.474 a.m., FLOTRON placed an Opposite Order to sell 55 gold futures contracts at the price of $1,285.10, which was three levels off the prevailing price at that point in time;

    c. Third, less than one second after placing the Opposite Order, FLOTRON's five-lot Primary Order was completely filled at 8:26:49.466 a.m.

    d. Fourth, over the course of the next four seconds, FLOTRON placed four additional Primary Orders totaling 16 gold futures contracts (in the form of three five-lot orders, and one one-lot order), all 16 of which were filled almost instantaneously.

    e. Fifth, at 8:26:53.118 a.m., FLOTRON cancelled his Opposite Order of 55-lots to sell without any part of the Opposite Order being filled. This 55-lot

---

[4] All times included in the Affidavit are in the Eastern Time Zone.

Opposite Order had been active in the market for approximately 4.644 seconds before FLOTRON cancelled it.

21. FLOTRON employed the pattern of trading activity summarized above in Paragraph 20 in the precious metals futures contracts markets several times during the approximate time periods of January 2009; September–December 2009; June–August 2010; March 2011; May 2011; June 2011; October 2011; December 2011; and October–November 2013.

22. Based on information provided by Bank A Trader #1, he believes that, based on his personal interactions with FLOTRON and the manner in which FLOTRON trained him to trade, and Bank A Trader #1's own experience of engaging in the spoofing practice, the trading pattern summarized above is consistent with an effort to trick other market participants and to place orders with the intent to cancel them before execution.

### FLOTRON Trains Subordinates on the Scheme to Defraud and Spoofing Practice

23. Bank A Trader #1 has admitted to engaging in the practice of spoofing. According to Bank A Trader #1, while he was a precious metals futures trader at Bank A, FLOTRON introduced and explained to him a trading strategy that was intended to deceive and trick other market participants by placing orders with the intent, at the time the orders were placed, to cancel them before execution.

24. According to Bank A Trader #1, beginning in or around July 2008, when he joined Bank A's precious metals trading desk in Stamford, Connecticut, and continuing for an approximately two-month period, FLOTRON was the primary trader assigned to train Bank A Trader #1. Bank A Trader #1 had received no formal training regarding precious metal trading before joining the trading desk. Instead, Bank A Trader #1 sat next to FLOTRON at FLOTRON's terminal on the precious metals trading desk in Stamford, shadowing and

observing FLOTRON as he traded. FLOTRON was training Bank A Trader #1 in anticipation that Bank A Trader #1 would move to Singapore and handle precious metals trading for Bank A on its Singapore trading desk.

25. According to Bank A Trader #1, during Bank A Trader #1's first week on the trading desk, FLOTRON introduced Bank A Trader #1 to the practice of entering orders with the intent, at the time the orders were placed, to cancel them before execution. Specifically, FLOTRON demonstrated this practice to Bank A Trader #1 several times. While shadowing FLOTRON, Bank A Trader #1 also observed FLOTRON personally place orders for certain precious metals futures contracts that FLOTRON had intended, at the time the orders were placed, to cancel before their execution.

26. According to Bank A Trader #1, when explaining how to trade precious metals futures contracts, FLOTRON told Bank A Trader #1 that he should (a) place an "iceberg" order[5] on one side of the market and then (b) place a large bid or offer, which was not an iceberg, on the opposite side of the market (the "Deceptive Strategy"). FLOTRON explained to Bank A Trader #1 that the opposite side order should be large in size and should be canceled quickly to avoid getting filled. FLOTRON further explained to Bank A Trader #1 that the Deceptive Strategy was intended to trick market participants' trading algorithms that were actively trading and operating in the precious metals futures contracts market in order to have the algorithms trade with the iceberg order.

---

[5] An "iceberg" order was a type of order that traders could place when trading futures contracts on the COMEX. In an iceberg order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order (i.e., the remainder of the order) that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire order was either executed or canceled.

27. According to Bank A Trader #1, and based on training and instruction provided to him by FLOTRON, Bank A Trader #1 personally engaged in the Deceptive Strategy on numerous occasions for the approximate time period of August 2008–November 2012.

28. According to Bank A Trader #1, he learned from FLOTRON to engage in the Deceptive Strategy by implementing the following pattern of order and trade activity in precious metals futures contracts markets:

   a. First, Bank A Trader #1 would place a small Primary Order on one side of the market that had a visible quantity that was close to the prevailing price at which that precious metals futures contract was trading;[6]

   b. Second, while the Primary Order was pending, Bank A Trader #1 would place one or more large orders on the opposite side of the market from the Primary Order that was at least (i) 30 lots if trading gold futures contracts, (ii) 15 lots if trading silver futures contracts, (iii) 20 lots if trading platinum futures contracts, and (iv) 20 lots if trading palladium futures contracts (the "Opposite Order") and close to the prevailing price at which that precious metals futures contract was trading;

   c. Third, at least one lot of Bank A Trader #1's Primary Order would be filled; and

   d. Fourth, after filling at least one lot of his Primary Order, Bank A Trader #1 would quickly cancel his Opposite Order, seconds after placing the Opposite Order and before the Opposite Order could be executed.

29. Bank A Trader #1 employed the pattern of trading activity summarized above in Paragraph 28 in the precious metals futures contracts markets several times during the approximate time periods of February–July 2010; September 2010; May–September 2011; January 2012; March–October 2012.

---

[6] According to Bank A Trader #1, he placed, and was trained by FLOTRON to place, his Primary Order as an "iceberg" order. Based on the data that the government has analyzed to date, Bank A Trader #1's trading patterns include the placement of Primary Orders on one side of the market that had small visible quantities, as described above in paragraph 28. This pattern may indicate the use of iceberg orders, although the data presently available to the government does not specifically designate these orders as iceberg orders.

11

30. The investigation has corroborated aspects of Bank A Trader #1's statements regarding his trading activity, as set forth in Paragraph 28. For example, Bank A Trader #1 engaged in the following:

    a. On October 2, 2012, at 4:53:10.836 p.m., Bank A Trader #1 first placed a Primary Order to sell two gold futures contracts at the price of $1,777.10, which was one level off the prevailing price at that point in time.

    b. Second, at 4:53:11.900 p.m., Bank A Trader #1 placed an Opposite Order to buy thirty gold futures contracts at the price of $1,777.00, which was one level off the prevailing price at that point in time.

    c. Third, approximately 3 milliseconds after placing the Opposite Order, Bank A Trader #1's two-lot Primary Order was filled at 4:53:11.903 p.m.

    d. Fourth, over the course of the next three seconds, Bank A Trader #1 placed four additional Primary Orders (in the form of four two-lot orders), totaling eight gold futures contracts. Six of those eight lots were filled almost instantaneously, one lot was filled in less than 1.297 seconds, and the remaining one lot was not filled and was cancelled after approximately 4.539 seconds.

    e. Fifth, at 4:53:15.130 p.m., Bank A Trader #1 cancelled his Opposite Order of 30-lots to buy without any of the Opposite Order being filled. The 30-lot Opposite Order to buy had been active in the market for approximately 3.230 seconds before Bank A Trader #1 cancelled it.

31. FLOTRON employed a pattern of trading activity similar to the pattern explained by Bank A Trader #1 (as summarized above in Paragraph 28) in the markets for precious metals futures contracts traded on COMEX. These incidents occurred in October 2008, January 2009; July 2010; March 2011; June 2011; and December 2011.

32. For example, FLOTRON engaged in the following:

    a. On December 12, 2011, at 1:20:14.037 p.m., FLOTRON first placed a Primary Order to buy one gold futures contract at the price of $1,667.20, which was one level off the prevailing price at that point in time.

    b. Second, at 1:20:16.417 p.m., FLOTRON placed an Opposite Order to sell 33 gold futures contracts at $1,667.60, which was four levels off the prevailing price at that point in time.

12

    c.    Third, approximately 185 milliseconds after placing the Opposite Order, FLOTRON's one-lot Primary Order was filled at 1:20:16.602 p.m.

    d.    Fourth, over the course of the next three seconds, FLOTRON placed two additional Primary Orders (in the form of two one-lot orders), totaling two gold futures contracts, both of which were filled almost instantaneously.

    e.    Fifth, at 1:20:19.466 p.m., FLOTRON cancelled his Opposite Order of 33-lots to sell without any of the Opposite Order being filled. The 33-lot Opposite Order to sell had been active in the market for approximately 3.029 seconds before FLOTRON cancelled it.

## CONCLUSION AND REQUEST FOR SEALING

33. Based upon the foregoing, there is probable cause to believe that FLOTRON, along with others known and unknown, participated and engaged in: (a) conspiracy, in violation of Title 18, United States Code, Section 371; (b) wire fraud, in violation of Title 18, United States Code, Section 1343; (c) commodities fraud, in violation of Title 18, United States Code, Section 1348(1); and (d) spoofing, in violation of Title 7, United States Code, Sections 6c(a)(5)(C) and 13(a)(2).

34. Because this is an application that pertains to an ongoing criminal investigation and because disclosure of the information contained herein as well as disclosure of the warrant being requested herein may compromise the investigation by informing the targets of the investigation of the nature and techniques of the investigation, and affording targets of the investigation an opportunity to flee or destroy or tamper with evidence or witnesses, I request that the arrest warrant, criminal complaint, application, and this Affidavit be ordered sealed by the Court, and be unsealed upon the arrest and initial appearance of FLOTRON.

DAMIAN R. PLATOSH, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Signed and sworn to before me this 12th day
of September, 2017, in Bridgeport, Connecticut.

THE HON. WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT

14